UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                         :

PATRICK DONOHUE, individually and as Parent and   :
Natural Guardian of S.J.D.,                         :

                          :

                  Plaintiffs,        :              26-CV-5329 (JMF)

                          :

         -v-                      :              ORDER

                          :

KAMAR H. SAMUELS et al.,                  :

                          :

                  Defendants.     :

                          :

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

As stated on the record at the conference held yesterday, the Court will hear oral argument on the preliminary injunction motions at the hearing on **July 30, 2026**, the time of which was moved to **9:30 a.m.**  At the hearing, the parties should be prepared to address the following topics and questions:

As to All Plaintiffs:

- What standard applies to these preliminary injunction motions?  More specifically, how should the Second Circuit's characterization of Section 1415(j) as an "automatic injunction" be reconciled with its analysis of at least some of the traditional preliminary injunction factors in cases asserting claims under that provision, such as *Mendez* and *Ramos*?  Do those cases, read together, suggest that the Court should evaluate these traditional factors when, as here, plaintiffs seek relief beyond a declaration of pendency placement and payment in the ordinary course?

- Is a showing of jeopardy to a student's pendency placement sufficient to secure a preliminary injunction directing immediate funding — or is it simply a necessary but insufficient prerequisite for securing such relief?

- Does the record support the conclusion that these students' placements at iBrain would be jeopardized if the DOE were ordered to pay tuition in the ordinary course for those students with undisputed pendency in iBrain?  More specifically, is the enrollment agreement dispositive on that question?  Or can the Court look beyond the contract to the parties' course of dealing and parents' understandings?

- Were the Plaintiffs whose cases were filed after July 1, 2026, disenrolled from iBrain because they did not, by that date, make payment or have a court order satisfying the

requirements of the enrollment contract?

- The Second Circuit has held that "[t]he IDEA provides district courts with broad discretion to grant such relief as the court determines is appropriate in order to carry out its statutory mandate." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 170 (2d Cir. 2014) (cleaned up).  Does that mean the Court has discretion, notwithstanding the contract, to order that the DOE can pay in the ordinary course?

- Should a Plaintiffs' entitlement to pendency placement at iBrain be treated differently from any potential entitlement to pendency transportation and nursing services?  That is, even if the Court were to hold that a student's pendency is in iBrain and order the DOE to fund tuition (either immediately or in the ordinary course), would it be required to order the same for payments to Sisters Travel and B&H Nursing?

- The *T.M.* Court held that a district was not required to continue reimbursing a plaintiff for pendency services previously obtained from private providers after it offered to provide those pendency services directly.  *See* 752 F.3d at 170.  Why doesn't that holding apply here, when the DOE has apparently offered to provide transportation services at no cost directly to each student?  Are those transportation services keyed to the level of service established in the relevant IHO/SRO decisions that form the basis of pendency?

- If a contract requires full payment up front — e.g., by July 1st — but the school district offers services later, what is the result?  If the district is not allowed to recoup those costs, how can that be reconciled with the result in *T.M.*?

- How can an order requiring the DOE to make payment by a certain date be reconciled with the *Mendez* court's observation that school districts be permitted to "implement basic budgetary oversight measures, such as requiring receipts before reimbursement," 65 F.4th at 63, with respect to pendency payments and the *de Paulino* court's statement that "it is the [District], not the parents, that is authorized to decide how (and where) the Students' pendency services are to be provided," 959 F.3d at 533.  Doesn't ordering expedited payment (even if not immediate) preclude the DOE from exercising those prerogatives?  What checks would exist against fraud and abuse?

    o For example, if the enrollment agreement in this case set tuition to $1 billion for a single student and demanded payment in full by July 1st but was otherwise the same as the contracts at issue, would the Court be required to order the DOE to make payments to that effect?

    o Similarly, if it turned out that a student was in the hospital and unable to attend iBrain or utilize her nursing and transportation services for several months, would the DOE still be obligated to make payments without being able to request receipts verifying the students' attendance or usage of those services?  If not, what is the legal rule that prevents that result?

- When an uncontested IHO or SRO decision establishes iBrain as a student's pendency

2

placement, but orders payment far below the current cost of tuition, are Plaintiffs still entitled to full payment per the terms of the 2026-27 enrollment agreement?  Or is payment restricted to the funding approved in that decision?

   o   Relatedly, Plaintiffs suggest it might be proper to cap the DOE's funding obligations at the cost of tuition and services incurred last year.  What would be the legal basis for doing so?  *See, e.g.*, ECF No. 44, at 19.  Would issuing an order to that end satisfy the terms of the enrollment agreement?

- How can the proposition that the DOE's pendency obligations attach upon the filing of a DPC be reconciled with the *de Paulino* court's holding that "it is the [District], not the parents, that is authorized to decide how (and where) the Students' pendency services are to be provided," 959 F.3d at 533?  That is, should the DOE be given some period of time upon the filing of a DPC to propose how and where pendency services should be provided before the Court orders pendency services and payments?

- Even if the DOE's pendency obligations attach upon the filing of a DPC, why does that preclude the DOE from waiting to make payments until there is a pendency order that defines the scope of its pendency obligations?  Isn't any harm from waiting mitigated by the fact that the pendency orders are issued retroactively to the date of the DPC filing?

- Is there any basis for the DOE's position that a sharp increase in tuition or service costs *alone* can operate as a unilateral change in pendency?  If so, by what percentage must the tuition or costs increase to constitute a chance in pendency?

- Are the claims as to the two Plaintiffs with pendency orders — Otero and Larach-Cohen — moot?  Have any other Plaintiffs received pendency orders in the interim?

As to the "Operative Placement" Plaintiffs:

- Did the parties understand the June 30, 2026 TRO to apply to these Plaintiffs?  *See* ECF No. 23, at 2 n.1.

- Are Plaintiffs' arguments regarding these students foreclosed by the Second Circuit's decision in *de Paulino*?  More specifically, does the IDEA require the DOE to propose a "pendency placement," as Plaintiffs contend, or just show that there was a previously implemented IEP?

- Does the DOE have the burden to produce the relevant documents it claims establishes these students' pendency (e.g., prior uncontested IEPs, prior CPSE IEPs, IHO/SRO decisions) and, if so, can it do so?  *See* ECF No. 43, at 6.  If the DOE cannot produce those documents, what is the legal effect of that failure?

As to the "Other Legal Source" Plaintiffs:

- Can an unchallenged pendency order alone serve as the basis for a pendency placement,

given the text of 34 C.F.R. § 300.518(d)?

<u>As to Next Steps:</u>

- Once the Court resolves the preliminary injunction motions, is there anything else to litigate?

- If so, should each of the 54 cases be re-assigned back to its original judge?  Or would it make sense for the Court to continue consolidation of all cases?  Do the answers to these questions depend on the resolution the Court reaches?  How so?

SO ORDERED.

Dated: July 29, 2026
New York, New York

_____
JESSE M. FURMAN
United States District Judge

4